(11 App. Div. 55.)

### NUTTING v. PELL et al.

(Supreme Court, Appellate Division, Second Department. December 30, 1896.)

CANCELLATION OF INSTRUMENTS—UNDUE INFLUENCE—EVIDENCE.

A deed by an epileptic of feeble mind, but competent to convey, will not be set aside after his death, for undue influence, because given without consideration to his grandmother, with whom he lived, and who was a woman of strong character and determined mind, where the deed was executed in lieu of a will, and accorded with the grantor's wishes as to the disposition of his property.

Appeal from special term, Kings county.

Action by Lee Nutting against Albert W. Pell, Arthur C. Pell, and William J. Pell, Jr., to set aside two deeds. From a judgment entered on a decision of the trial judge in favor of defendants, plaintiff appeals. Affirmed.

Argued before BROWN, P. J., and CULLEN, BRADLEY, and HATCH, JJ.

John F. Bradner, for appellant.

Willard N. Baylis, for respondents.

BROWN, P. J. This action was brought to set aside two deeds of real estate, one executed by Lee Folger Nutting to his grandmother, Mary Ann Folger, dated May 15, 1890, and one executed by said Mary Ann Folger to the defendants in this action, dated June 13, 1890, both of which deeds were recorded in March, 1895. The said Lee Folger Nutting died March 24, 1891, intestate, never having been married, leaving his father, the plaintiff in this action, as his sole heir at law. Mrs. Folger, his grandmother, died in March, 1895. It appears from the testimony that in March, 1889, William B. Folger died in the city of Brooklyn, seised and possessed of a considerable amount of real estate, of which that conveyed by the deeds in question was a part. He left, surviving him, his widow, Mary Ann Folger, a daughter, Mary E. Pell, and a grandson, the said Lee Folger Nutting, who was a son of a deceased daughter. He left a last will and testament, whereby he devised, with a few exceptions, all his property to his widow, to be used, and the income thereof applied, during her life, for the use and benefit of herself and her sister Emily Grant. He devised a house and lot, known as "212 South Third Street," in the city of Brooklyn, to his grandson, if living at the time of his death, and to his daughter he bequeathed a legacy of $500. The will then provided as follows: "Knowing my wife will dispose of the little I have to leave when she has no further use for it, with justice and equity, to her daughter and grandchildren, I make no further disposal, believ-

ing they will each receive according to their merits." Upon the pro-
ceeding instituted for the probate of said will, a guardian ad litem
was appointed for the said grandson, upon the petition of the plain-
tiff, on the ground that he was mentally incapable of protecting
his rights, and objections were filed to the probate of said will by
the guardian, and also Mrs. Pell. Thereafter an agreement was
entered into and executed by and between all the parties interest-
ed in the estate, whereby all the property of said William B. Fol-
ger was conveyed to trustees, to hold and manage the same dur-
ing the life of Mrs. Folger, and apply the net income thereof to
her use, and upon her death to divide the personal property, and
make partition of the real estate, among the parties named in the
said agreement. Subject to such direction, one-half of said property
was conveyed to the defendants in this action, and one-half to said Lee
Folger Nutting. The deeds which are the subject of this action were
made for a nominal consideration of one dollar. The plaintiff alleges
in his complaint, as the ground for the relief he seeks, (1) that said
Lee Folger Nutting, at the time of the execution of the deed to Mrs.
Folger, was mentally incapable of understanding or comprehending
the nature of the transaction; (2) that the deed was the product of un-
due influence and fraud. The trial court determined both of these
questions in favor of the defendants, and from the judgment entered
on that decision the plaintiff has appealed to this court.

Upon the question of the mental incapacity of the deceased, we deem
it sufficient to say that we think the finding of the special term is sup-
ported by the weight of testimony. It is impossible to give credit to
the testimony of the defendants' witnesses on this branch of the case,
and reach any other conclusion. While the deceased was of weak
intellect, his acts and conversations and his letters which appear in
the record before us indicate quite clearly that he understood the char-
acter and extent of his property, and was possessed of sufficient mental
power and capacity to deal with the same, and to understand the char-
acter and effect of the deed he executed to his grandmother. It is
necessary, therefore, that we consider only the relations existing be-
tween the deceased and his grandmother, and determine whether, up-
on the law and the testimony, a case was made which would justify a
court of equity in declaring void the conveyance to Mrs. Folger. Lee
Folger Nutting was born in November, 1867. From the age of seven
years, until his death, he was an epileptic. He was constantly under
a doctor's care, and his health was always bad, and his disease im-
paired to a considerable extent his mind. His mental powers were
always weak. His father was three times married, and he was the
only child of the first marriage. The greater portion of his life he
lived with his grandfather and grandmother. After the settlement
of his grandfather's estate, and in the fall of 1889, he became an in-
mate of his grandmother's family, and with short intervals, when he
was visiting elsewhere, he lived with her and her sister, Emily Grant,
until his death. Mrs. Folger is shown to have been a woman of
strong character and determined will, and she frequently expressed,
in the presence of her grandson, a regret that she had executed the

agreement in reference to the settlement of her husband's estate. Without referring at length to the testimony introduced upon this branch of the case, we think it is sufficient to say that the deceased was a person upon whom undue influence could have been easily exercised, and we are convinced that it would not have been difficult for any one in whom he reposed confidence to have influenced him in the disposition and disposal of his property.

Two questions arise upon this testimony: First. Was the relation between the deceased and his grandmother of such a character as to impose the burden of proof upon the defendants of showing that the transaction was just and fair, and that no undue advantage was taken by Mrs. Folger of her grandson's weak physical and mental condition? Second. If their relations were of such a character, was that burden successfully met, and the presumption that the deed was the product of fraud overcome by the testimony?

The rule of law applicable to a case of this character, where a fiduciary relation is shown to exist, is well settled. It is stated in Pom. Eq. Jur. § 951, as follows:

"Where an antecedent fiduciary relation exists, a court of equity will presume confidence placed and influence exerted. Where there is no such fiduciary relation, the confidence and influence must be proved by satisfactory extrinsic evidence. The rules of equity and the remedies which it bestows are exactly the same in each of these two cases."

In Cowee v. Cornell, 75 N. Y. 91, it was said by Judge Hand:

"Whenever the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side, from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or on the other, from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary, and well understood. This is, I think, the extent to which the well-considered cases go, and is the scope of 'constructive fraud.'"

In Fisher v. Bishop, 108 N. Y. 28, 15 N. E. 331, the court said:

"The rule is not limited to cases of attorney and client, guardian and ward, trustee and cestui que trust, or other similar relations, but it holds good wherever fiduciary relations exist, and there has been a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding."

And in Cowee v. Cornell, supra, it is further said:

"While the doctrine is without doubt to be extended to many other relations of trust, confidence, or inequality, the trust and confidence, or the superiority on one side, and weakness on the other, must be proved in each of these cases. The law does not presume them from the fact, for instance, that one party is a grandfather, and old, and the other a grandson, and young, or that one is an employer and the other an employé. The question as to parties so situated is a question of fact, dependent upon the circumstances in each case. There is no presumption of inequality either way from these relations merely."

It is very plain that the deceased had no occasion to ask or seek advice as to his property. He was not in the possession or enjoyment of it, and he had no occasion to be advised about its management or disposition, and his grandmother had no duty to perform towards him in that respect other than grew out of their

blood relationship. But I do not deem it material in this case to determine whether the relation between the deceased and his grandmother is to be deemed as fiduciary or confidential or otherwise. The plaintiff offered no testimony upon the question of undue influence. All his evidence was directed to the mental incapacity of his son. All the knowledge we have of the transaction in question, or the conversations that led up to it, or the inducement or motive that prompted the execution of the deed, we derive solely from the defendants' witnesses. So far as the plaintiff's case rests upon the question of undue influence, it rests upon presumption alone; and we therefore may consider it entirely from that standpoint, and determine whether, upon the testimony introduced by the defendants, it appears to our satisfaction that the transaction was a fair and just one. This view of the case is the most favorable to the appellant that can be taken.

Upon the first view of a case of this character, it shocks one's sense of justice that a youth of weak and feeble intellect should, for no consideration whatever, absolutely strip himself of every dollar of property that he possesses; and, where such a transfer is made to a relative of strong, vigorous mental and physical condition, it is difficult to resist the conclusion that it must have been the result of overpersuasion, and the influence of a strong mind upon a weak one. And, was the validity of such a conveyance attacked by the grantor in his lifetime, I think the result undoubtedly would be that it would be declared void, and set aside. On the other hand, had the deceased made precisely the same disposition of his estate by will which he made by the deed or deeds in question,— that is, had he given all of his property either to his grandmother or to his cousins,—I think no one would, in the absence of testimony of actual fraudulent representations or overpersuasion, have questioned the entire propriety and validity of such an instrument. In considering the case, therefore, the natural inquiry is as to the state of mind of the grantor in reference to the disposition of his property, and to his probable term of life. Upon this inquiry, the defendants' testimony is quite satisfactory, provided it is worthy of belief. It comes from four witnesses,—Mrs. Grant, his grandmother's sister, with whom he lived a greater part of his life; his aunt Mrs. Pell, the mother of the defendants; and from two other witnesses, Myra L. Bates and Catherine Cook. None of these witnesses have any direct interest in the result of this litigation. But Mrs. Pell may be assumed to desire the success of her sons, who are the defendants, and Mrs. Grant may be assumed to be interested in sustaining the integrity of her sister's conduct. The other witnesses do not appear to have any interest of any kind in the result of the action, but both did admit upon the trial that they desired to see the defendants succeed. The substance of the testimony of these witnesses is that the deceased was not satisfied with the justice of the settlement of his grandfather's estate. He appears to have thought that upon his grandmother's death the division should have been per capita, rather than per stirpes. He

also appears to have thought that his share of the property upon his death should go to his cousins, the defendants, and not in such a direction that it might ultimately reach his father's children by his third wife. He was also impressed with the fact that he had not a long time to live, and that his grandmother would survive him. He had been advised that he could make a will, and he told the witnesses Bates and Cook that he could do with his property as he liked. It is not shown that these opinions or ideas were implanted in his mind by anything that emanated from his grandmother or his aunt or any of the defendants. Indeed, so far as the defendants themselves are concerned, it is not shown that the deceased ever had any conversation with any of them in reference to his property. So far as we know, therefore, these opinions represented the deceased's own view of right and justice in the final disposition of his grandfather's property. If we assume, therefore, that such was the state of his mind, there is nothing wrong in the conveyance in question. Desiring and intending that his estate should go to his cousins upon his decease, the manner in which that transfer was accomplished or made is of no moment whatever. The question is: Was his act in reference to the transfer of his estate a voluntary and intelligent one, or was it the product of fraud, misrepresentation, or undue influence? I have not overlooked the fact that the suggestion that he executed a deed, instead of making a will, came from his grandmother, and that, when the deed was executed, she directed that the fact of its execution be kept a secret, and that neither the deed to her or the deed to the defendants should be placed upon the record until after her death. But she gave her reasons for this advice. It was that a deed could not be attacked so easily as a will. Whether that was true or not is of little consequence. Her opinion upon the subject was the result, doubtless, of her experience in reference to her husband's will. The deceased was acquainted with the fact that a contest had been made over that will, and that there had been a settlement of the estate; and it is not inconsistent with entire honesty that the grandmother, as matter of fact, held and expressed the opinions on this subject which she did.

I am not unmindful of the fact that by keeping the deed from the record, and suppressing all information of the fact of its execution, the deceased may have been deprived of advice which might have induced him to make other disposition of his property. But assuming, as I do, what I think the testimony fairly establishes, that the deceased desired his property to go ultimately to his cousins, and that he believed that his own death was to occur at an early date, and very probably before the decease of his grandmother, I do not regard it as indicative of any fraud or undue influence that a method of transfer was advised by the grandmother, or adopted by him, the effect and tendency of which was to avoid a contest during his lifetime and that of his grandmother in reference to the control and disposition of his property. It was natural that he should have intrusted the execution of his wishes in ref-

erence to the disposition of his property to his grandmother; and, as she had the sole right to the possession and enjoyment of the estate during her life, there was no necessity that the deed should have been put on record until after her death. It appears quite clearly that she was dissatisfied with the settlement of her husband's estate, especially with that part of it which deprived her of the management of the property. It may be that she also thought that she had, under her husband's will, a power of disposition over the estate, a power which by the settlement she had given up. The question of the construction of Mr. Folger's will in reference to this power is one that is not entirely free from doubt. If such was the case, if the will did give to her the power of the final disposition of the estate, there was nothing wrong or suspicious in the fact that the deceased conveyed the property to her, rather than directly to his cousins. The explanation of the form of the transaction is thus found in the terms of Mr. Folger's will, and in the final settlement of the estate, and the dissatisfaction of the grandmother and the deceased which grew out of that fact.

In my judgment, the vital question in this case is whether the transfer of the property was in accord with the wishes of the deceased. The manner in which that disposition was made is not of great consequence, if it was his free and voluntary act. There is no particular equity on the plaintiff's part which requires the court to lean to his side of the case. The property in question all came from the deceased's grandfather, and, by the conveyances in question, it is transferred to those who, so far as we can judge from his will, he intended should be the ultimate possessors thereof. While I am of opinion that a transaction such as that now before us should be looked upon with suspicion, and receive careful examination and investigation, I am constrained to say, after reading the testimony and very careful reflection, that the deed, in my judgment, was not the product of any undue influence; that it fairly represents the wishes of the deceased in reference to the final disposition of his property; and that the conclusion of the trial court was correct.

The judgment should be affirmed, with costs. All concur.